# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Kellogg Brown & Root Services, Inc. ) | ASBCA Nos. 57530, 58161 |
| ) | |
| Under Contract No. DAAA09-02-D-0007 ) | |

APPEARANCES FOR THE APPELLANT:  Craig D. Margolis, Esq.
Christian D. Sheehan, Esq.
  Arnold & Porter Kaye Scholer LLP
  Washington, DC

Amy L. Riella, Esq.
Carla Jordan-Detamore, Esq.
Christina J. Ferma, Esq.
  Vinson & Elkins LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Arthur M. Taylor, Esq.
  DCMA Chief Trial Attorney
Carol Matsunaga, Esq.
  Senior Trial Attorney
Kara M. Klaas, Esq.
  Trial Attorney
  Defense Contract Management Agency
  Carson, CA

Russell B. Kinner, Esq.
Patrick M. Klein, Esq.
David W. Tyler, Esq.
  Trial Attorneys
  U.S. Department of Justice
  Washington, DC

## OPINION BY ADMINISTRATIVE JUDGE MELNICK

This appeal involves the government's LOGCAP III contract with Kellogg Brown & Root Services, Inc. (KBR). Through this contract, the government acquired support services during United States military operations in Iraq. KBR seeks the costs it incurred settling two requests for equitable adjustment submitted by a subcontractor providing accommodations to house military personnel. Because KBR has failed to demonstrate that the costs were reasonable, it is not entitled to recover.

## FINDINGS OF FACT

1. In 2001, the United States Army awarded Contract No. DAAA09-02-D-0007, commonly called LOGCAP III, to KBR (originally Brown & Root Services, Division of Kellogg Brown & Root, Inc.) (app. supp. R4, tab 47). LOGCAP III required KBR to perform various support services for the government through individual task orders (app. supp. R4, tab 47 at 4668, 4718-19). *See Kellogg Brown & Root Servs., Inc. v. United States,* 728 F.3d 1348, 1353 (Fed. Cir. 2013). Among the clauses incorporated into LOGCAP III were Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST AND PAYMENT (MAR 2000); and FAR 52.244-6, SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (OCT 1998) (app. supp. R4, tab 47 at 4699, 4708).[1] Section H-16 of the contract's special provisions for contingency operations provided that, while performing contract duties, the Service Theater Commander would "provide force protection to contractor employees commensurate with that given to Service/Agency...civilians in the operations area" unless otherwise stated in a task order (*id.* at 4759).

2. In early August 2003, after United States forces entered Iraq, the government executed LOGCAP III Task Order (TO) 59 (R4, tab 201). TO 59 was a cost-plus-fixed-fee order for services from KBR in support of operations in Iraq (*id.* at 200009). On October 10, 2003, the government executed Statement of Work Change 5 (incorporated into Modification No. 06 to TO 59) (R4, tab 225). Among many things, Change 5 required KBR to provide living accommodations to CJTF-7 and other coalition forces in various locations in Iraq (*id.* at 200293). CJTF-7 was the combined joint task force designated as the command and control headquarters for the Iraq theater of war (tr. 2/71).

3. Change 5 stated that it was "the Commander's intent to rapidly bed down the remainder of CJTF[-]7 soldiers...in accordance with established and provided priorities" (R4, tab 225 at 200293). Prior to this effort, soldiers slept wherever they could in temperatures that could exceed 100 degrees. The locations included abandoned schools, public buildings, homes, tents, vehicles, the ground, or any other place soldiers could put a sleeping bag. (Tr. 2/110-11) The military sought to provide facilities to escape harsh conditions so soldiers could recharge for future missions (tr. 2/112). The accommodations constituted over 18,000 containers or trailers containing specified furnishings, environmental units, lighting, and meeting other requirements, to be delivered to multiple sites in Iraq (R4, tab 225 at 200297-329; tr. 3/70).[2] The Commander established an aggressive goal to "bed down" all the soldiers by Christmas of 2003 (tr. 2/112). Accordingly, with exceptions not relevant here, Change 5 required the trailers to be

---

[1] The contract states the clause is dated "OCT/2001" (app. supp. R4, tab 47 at 4708). No such clause was discovered. The version of the clause dated "OCT 1998," which was in existence at the time of contract award and bears the same title as the referenced clause in the contract, is deemed applicable.

[2] All of the accommodations are referred to as trailers.

provided "[n]o later than" December 15, 2003 (R4, tab 225 at 200296-97). Change 5 stated that "[t]he government [would] provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines" (*id.* at 200294).

4. One of the numerous sites described in Change 5 was "Site A", known as Camp Anaconda (R4, tab 225 at 200296, -298; app. prop. finding 17). Camp Anaconda (also called Balad) was the main supply and logistics base for Iraq (tr. 2/89). KBR was to provide, set-up, operate, and maintain 2,252 trailers at Camp Anaconda. It was also required to perform site preparation and produce a site layout (with the assistance of appropriate government engineers). (R4, tab 225 at 200304-05)

5. KBR defined a minimum standard for its trailers based upon a design from a Saudi Arabian contractor named Red Sea. However, Red Sea would not deliver the trailers to sites in Iraq, and KBR did not have the resources to perform that function itself. So it decided to subcontract out the complex logistical issues associated with purchasing the units, transporting them under extremely hazardous conditions that threatened life and equipment, installing them, and assuming the associated risks. (R4, tab 625; tr. 8/39-40)

6. On October 17, 2003, one week after Change 5 was issued by the government, KBR and First Kuwaiti Co. of Kuwait (FKTC) executed a firm-fixed-price subcontract (Subcontract 11) in the amount of $80,978,562 for the procurement and delivery to Camp Anaconda of 2,252 prefabricated trailers (app. supp. R4, tab 62). The subcontract was to be construed and governed by the laws of Texas (*id.* at 4937). FKTC was to manufacture the trailers and then transport them to a staging yard bordering Iraq. From there, FKTC would transport them and their contents in convoys to Camp Anaconda. "Security of Subcontractor personnel in convoys and on site, [would] be provided commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines." FKTC would provide all equipment and labor to set-up and install the trailers. (*Id.* at 4923-30) FKTC represented that Red Sea would be its main trailer manufacturer (app. supp. R4, tab 56 at 4905; tr. 5/124). KBR considered the transportation component of the subcontract price to cover all movement costs, including any "prolonged delays at border crossing sites" (app. supp. R4, tab 270 at 8330).

7. Section 4.0 of the subcontract was titled "TIME OF PERFORMANCE." Section 4.1 required FKTC to begin work the next day, October 18. In accordance with Change 5 it was to complete all work by December 15. However, the section recognized that allowances would be made "for delays in KBR convoy coordination and support." Section 4.2 required FKTC to "make whatever adjustments in working hours, manpower, equipment, etc., deemed necessary by" KBR. The costs of those adjustments would be to FKTC's account. (App. supp. R4, tab 62 at 4924)

3

8. The subcontract contained General Conditions, supplemented by Special Conditions. In the event of conflict, the Special Conditions took precedence (app. supp. R4, tab 62 at 4943). General Condition 3.2.5 stated that if FKTC was delayed by the government's or KBR's failure to perform, or by order of KBR, FKTC would be entitled to an equitable adjustment in compensation and/or time of performance if the delay substantially increased FKTC's costs or the time its equipment and forces were on site (*id.* at 4933).

9. General Condition 8.1 and Special Condition 4.0 provided separate Changes clauses. However, Special Condition 4.3 stated that, except as provided in that clause. no order, statement or conduct would entitle FKTC to an equitable adjustment. Special Condition 4.4 required an equitable adjustment for changes increasing or decreasing FKTC's costs or time for performance. Special Condition 4.5 required FKTC to assert its right to such an adjustment by timely furnishing KBR a written statement of the amount of its proposal and a detailed cost breakdown. The costs were to conform to Part 31 of the FAR and the Department of Defense (DoD) FAR Supplement. (App. supp. R4, tab 62 at 4936, 4947-48)

10. General Condition 9.4 of the subcontract required FKTC to maintain books and records reflecting its performance and to preserve them for three years after completion. It granted KBR the right to inspect and audit those parts of the records relating to cost reimbursement or performance of labor provisions. It required copies of those records supporting requests for payment or compliance with labor related subcontract provisions to be furnished to KBR. (App. supp. R4, tab 62 at 4937)

11. FKTC was a Kuwaiti contracting and construction firm with multi-million dollar projects. It had a number of contracts with the government, including embassy construction. FKTC had approximately 70 subcontracts with KBR in 2003-04. One of its founders was an expert in finance and it also maintained a finance department led by a manager with 19 years of experience. FKTC had continual growth, making it one of Kuwait's largest companies. All of these factors demonstrate that it functioned at a sophisticated level. (Tr. 5/120-21, 7/237-39, 9/238-49)

12. On October 16, 2003, KBR awarded another subcontract (Subcontract 10) to American General Trading and Contracting W.L.L. (AGT) for the delivery of trailers to other locations (R4, tab 233).

13. Main Supply Route (MSR) Tampa was the critical road for transporting supplies into Iraq from Kuwait (tr. 2/82-83, 3/31). The convoy staging area at the Kuwait border was called Navistar (tr. 2/84, 210-11). Because there was a war on, MSR Tampa was extremely dangerous. Insurgent attacks began in the spring of 2003 and people were shot and killed. (Tr. 2/86, 102-03) Among those who frequently lost their lives were KBR affiliated personnel. Its vehicles were attacked at least as early as July 2003. (App. supp. R4, tab 214 at 5699; R4, tab 218; tr. 2/86, 137) KBR was

4

aware of and concerned about convoy force protection prior to the issuance of TO 59 (tr. 3/157). In June 2003, the military imposed movement restrictions, requiring military control and escorts into Iraq of all assets, including contractors (tr. 2/86-87, 96, 102-03). The military required the escorts to reduce disruptions that would otherwise arise from attacks upon unescorted elements (tr. 2/87-88).

14. The resources available to escort convoys into Iraq were not unlimited. However, the volume of materials that had to be transported was massive. Providing force protection to all the material moving into Iraq required prioritization of resources. It was impossible for everything to move immediately. Indeed, even in a fantasy world containing unlimited force protection assets, security threats and other constraints, such as the status of communication lines, could delay the delivery of materials. The dangers posed on the road delayed the movement of armed convoys. (Tr. 2/103-06, 3/40, 250) In a perfect world, people would not be shooting at the convoys. However, insurgents aggressively disrupted convoys, stranding vehicles and drawing escorts to other assignments using direct fire and explosives. (Tr. 2/184, 3/29-30) Sometimes, intelligence would conclude that the roads were too dangerous for travel at all and they would "go black" for days, meaning personnel were to stay off them (tr. 3/254). Not surprisingly, the military initially gave key war-fighting needs priority, such as food, fuel, ammunition, barrier material, repair parts, and medical supplies (tr. 2/104, 106). The CJTF-7 commander established those priorities (tr. 2/106). Significantly though, not even food was a priority in times of major fighting (tr. 2/106, 145). And, though living trailers were important to troop morale, they were not a relative priority either (tr. 2/108, 144-46; app. supp. R4, tab 146). KBR understood when issuing its subcontract to FKTC that the military determined the priority of convoy shipments (app. supp. R4, tab 492 at 27). The military used military police, augmented with all types of other units, to provide convoy escorts (tr. 2/114-15). Despite limited escort resources and security threats, hundreds of trucks usually crossed the border everyday, and everything that moved received force protection (tr. 2/102-03, 215).

15. As the summer of 2003 turned to fall, the insurgency in Iraq intensified along with corresponding attacks on KBR convoys (app. supp. R4, tab 140; tr. 2/120, 152-53). At the same time, the military was rotating forces into and out of the theater. Delays in transporting supplies followed for various reasons, including coordination problems in Kuwait, arrival of resources, vehicle breakdowns, efforts to militarily secure the country, discovery of explosives on the roads, and other reasons that inevitably occur while performing such operations over the extended distances at issue. (Tr. 2/128, 138, 156, 3/255) In essence, the effects of war on the roads limited the progress of convoys (tr. 4/196-97). Every day the military kept KBR aware of the security situation to maximize its coordination of assets (tr. 2/139-43). Both the military and KBR worked as hard as they could to support the troops and get convoys out of Kuwait (tr. 4/199).

5

16. Because of the dangerous conditions in Iraq, and the limitations upon the military's resources to escort convoys, trailers backed up at the Kuwait/Iraq border waiting for escorts (tr. 2/213-14, 3/40, 5/65). As of November 20, 2003, FKTC reported to KBR that it had "250 trucks ready to go and more than 200 units ready in our yard" (R4, tab 591 at 202741). At that time, food and fuel for Iraq was the military's convoy priority (*id.* at 202742). By November 29, trailers were also delayed due to hazardous road conditions (*id.* at 202758). By December 2, 150 trucks were waiting (app. supp. R4, tab 121). When the administrative contracting officer (ACO) discussed extending the period for delivering trailers, Army leadership initially objected (tr. 3/89-90). Nevertheless, on December 10, 2003, KBR and FKTC executed a subcontract change order extending the period for completion of all works at Camp Anaconda to February 1, 2004, to account for convoy delays (app. supp. R4, tab 130). There is no evidence that the government objected to this extension.

17. On December 13, 2003, KBR issued another change order to the subcontract with FKTC, adding a requirement for the delivery and installation of an additional 1,760 trailers at Camp Victory (also known as BIAP), a command center adjacent to Baghdad International Airport. The change was implemented because KBR decided that AGT was unable to perform that portion of its subcontract. The order established January 1, 2004, for the completion of performance at that location and increased the subcontract's total firm-fixed price to $144,748,862. The deadline was approved by the ACO. (App. supp. R4, tabs 133, 492 at 35-36; tr. 2/88)

18. On December 23, 2003, Kuwaiti officials ordered FKTC to remove overflow trailers from state property near the Iraq border (app. supp. R4, tab 145). FKTC had entered two land leases with Al-Nour International Holding Co., at 90,000 Kuwaiti dinars per month for eight months (app. supp. R4, tab 76). FKTC removed all of the trailers waiting at the border from their trucks and stored them on the land (called a laydown yard) until they could be placed back on other trucks and into convoys for transportation to Iraq (app. supp. R4, tab 223 at 6643, tab 320 at 9389-90; tr. 4/113-14, 5/125). The number of backed-up trailers eventually exceeded over 1,000 (app. supp. R4, tab 213 at 5655, tab 503 at 256).

19. Once at Camps Anaconda and Victory, the military designated trailer locations, and stated it would reconfigure and grade the land, cover it with gravel, and provide links to power generators (app. supp. R4, tab 65; tr. 3/66, 182, 185, 240-44). KBR was to install trailers, trench for utilities, and plum the units (tr. 3/185-86). KBR proposed initial trailer layouts, but the military adjusted those plans to increase trailer dispersion (tr. 3/199-200). Accordingly, the number of areas and their layouts changed and an extensive effort was required to prepare the land (tr. 3/67, 200-02, 240-44, 251). These changes, along with reprioritization of resources to address threats from explosives, delayed site preparation (tr. 3/66, 196; tr. 5/64). When a trailer arrived at a camp and a permanent site was not ready for it, it had to be double handled. That meant it was removed from the delivery truck and placed in a laydown yard to wait. When its

permanent location was ready, the trailer was reloaded onto a truck, moved across the camp, and placed into its final location. (App. supp. R4, tab 320; tr. 3/225, 251) For the first two or three months that trailers arrived at Camp Victory, the same crane offloaded trailers at laydown yards and installed them in their final positions (tr. 3/252-53, 257-58). The term "double handling" was used in this appeal to refer to both the transfer on and off trucks at the camps, as well as onto and off the land at the Kuwait border.

20. Through a series of additional change orders, KBR and FKTC extended the subcontract's period of performance for both camps to August 1, 2004, to address trailer backups (app. supp. R4, tabs 162, 174, 191, 204). The government did not object.

21. FKTC submitted a proposal to KBR that KBR characterizes as a request for equitable adjustment (the double handling REA) (app. supp. R4, tab 212). The document roughly broke into three cryptic sections. The first section referred to the leasing of land for temporary storage of trailers intended for Iraq, along with other services. Its line items provided monthly rates (not costs) for the lease of land at the border, site preparation, security, temporary office space, power, lights, cranes, flatbeds, a loader, forklifts, "protect[ion]...from Natural Calamity," "Skilled worker[s]," a supervisor, food for drivers, and transportation. These items added up to $1,611,966 per month. FKTC stated that this was "a monthly rate for storage and double handling of 4083 units for both Anaconda and Victory." It multiplied that amount over eight months to total $12,895,728.

22. The second section of the REA stated that it contained costs arising from double handling for Camp Victory. It again provided monthly rates (not costs) for items like those in the first section. These added up to a monthly rate of $535,000. FKTC multiplied this figure by five months to total $2,675,000. (App. supp. R4, tab 212 at 5644)

23. The third section of the REA referred to repairs consequent to double handling. It did not describe any repairs, or what might have happened to require any, but charged $300,000 for skilled workers, along with additional amounts for a supervisor, engineers, food, buses, trucks, and other vehicles. These added up to a monthly rate (not costs) of $508,150. FKTC multiplied that figure by five months to reach $2,540,750. FKTC then added $550,000 for tools, equipment, and materials to total $3,090,750. Finally, FKTC sought $15,106,500 in overhead. All together, the double handling REA initially sought $33,767,978. (App. supp. R4, tab 212 at 5645-46)

24. KBR's subcontract administrator determined that KBR had ordered FKTC to perform double handling and had "guaranteed" FKTC reimbursement of costs. He requested FKTC to submit an itemized breakdown. He inspected some trailers identified as having been repaired. He also sought information from other KBR

7

personnel about contract and cost information it incurred to lease equipment in Kuwait for the purpose of comparing prices. (App. supp. R4, tabs 227, 229, 472-73; tr. 4/32)

25. On June 21, 2004, FKTC revised its payment demands, adding double handling and repair costs for Camp Anaconda. The total sought was $30.6 million. (R4, tabs 219-21, 224-25) Like the initial submittal, the revised version and associated documents stated rates and prices for the listed equipment and services. FKTC did not disclose its costs, despite the fact that it did maintain records of some equipment costs. (App. supp. R4, tabs 232, 314 at 9340-53; tr. 4/116-19, 129, 131, 191-92, 8/68-69) Indeed, KBR lost interest in ascertaining FKTC's costs of performing the work at issue. Instead, it focused on FKTC's stated prices and its own opinions of appropriate prices. (App. supp. R4, tab 227; tr. 4/32-38, 115-16, 129-36, 144-45) A price is typically cost plus profit (tr. 9/231). So, prices are normally higher than costs. Furthermore, KBR never verified what additional equipment FKTC used to complete its work (app. supp. R4, tab 304).

26. On August 1, 2004, KBR and FKTC executed a change order adding $23,831,147.25 to the subcontract price. The order provided that it encompassed all double handling charges, repairs caused by double handling, repairs arising from poor site preparation, and repairs arising from government use. The parties derived the total from specified prices they established for each category of charges, including $3,600,000 for the lease of land in Kuwait. (App. supp. R4, tab 236) KBR executed the change order after deciding that FKTC's prices were fair and reasonable (tr. 4/38).

27. On July 15, 2004, FKTC submitted another proposal to KBR for an equitable adjustment. This one was in the amount of $41,971,166 associated with 83,942 claimed days of idle truck time FKTC alleged occurred at the Kuwait/Iraq border (the delay REA). (R4, tab 591) As was the case with its double handling/repairs request, FKTC did not base its delay REA upon actual costs. For example, the truck leases FKTC submitted redacted the prices FKTC paid for trucks, thereby refusing to disclose its costs (app. supp. R4, tab 314; tr. 4/120, 227-30, 241, 6/150-51). FKTC simply proposed a $500 daily price for an idle truck and driver (app. supp. R4, tab 242; R4, tab 591 at 202705, 202915; tr. 4/120). Nor did FKTC present records of the number of days individual trucks actually waited to cross the border, though it had recorded when trucks crossed the border (tr. 4/199-200, 7/271-76).

28. FKTC did not calculate its actual number of delay days (tr. 7/257). It proffered a model that (with some adjustments and assuming specific total numbers of trucks were available) presumed, without substantiating data or records, that each day the number of trucks necessary to ultimately complete final delivery within the subcontract's period of performance actually arrived at the border. It also assumed that each truck took a specified amount of time (five or seven days) to deliver trailers and was not delayed in Iraq. In fact, the trip into Iraq and back could take weeks. FKTC then simply subtracted from the total of all assumed daily arrivals at the border

the number of trucks that proceeded across the border on a particular day, deriving a total number of truck delays for that day. It aggregated each day's number of delays over the total period it said delays occurred. (R4, tab 591; tr. 4/194-203, 7/257-91, 9/33-35) The model assumed 600 trucks were available to serve both Victory and Anaconda. It assumed every truck arriving at the border would be placed into a convoy for Iraq the very next day, and therefore all idleness at the border was compensable. It also assumed a perfect world where everything worked flawlessly. (Tr. 7/263, 267, 269, 280-81, 9/33, 58-59)

29. This plan was not realistic (tr. 8/82-83). In fact, it was not known where all the trucks were at any given time (tr. 4/198, 202). Furthermore, the model failed to account for trailers offloaded onto the leased land, relieving trucks from having to wait. According to the model, on multiple occasions FKTC experienced over 400 truck delay days on a single day, though FKTC had said it only needed between 100 and 150 trucks available for convoys per day (R4, tab 591 at 202915-926; tr. 5/125). FKTC did not always have the number of trucks available at the border dictated by the model or have access to the model's required number of trucks. Sometimes, FKTC calculated more delay days than possible for either the assumed or actual number of trucks available. (Tr. 9/37-38, 51-78) As one example, FKTC reported on December 2, 2003, that it had 150 trucks waiting, but the model charged for 403 (app. supp. R4, tab 121; R4, tab 591 at 202922). FKTC and KBR also maintained status reports showing the number of trailers waiting at the border on specific days, and a Delivery Report for particular days showing the number of trailers waiting on trucks. These reports generally showed lower numbers than the Delay REA. (R4, tabs 266, 276, 280, 303, 440, 482, 487, 495; app. supp. R4, tab 213) FKTC also attached to its REA numerous communications with FKTC discussing significantly different numbers of trucks and trailers available at the border than shown in the model (*see* gov't br. at 142 (citing various materials contained in R4, tab 591)).

30. On August 4, 2004, FKTC amended its request to slightly lower the number of delay days to 83,078 and reduced the daily rate to $300 "based upon...competitive market rates," (not costs), lowering the total sought to $24,923,400 (app. supp. R4, tab 239; tr. 4/42, 233, 237-38).

31. Upon reviewing FKTC's delay proposal, on August 2, 2004, KBR's subcontract administrator informed its procurement and supply manager for LOGCAP III that the subcontract did not entitle FKTC to payment for convoy delays. He also stated that FKTC's $500 daily rate was a market rate, and suggested that any request had to be supported by actual costs incurred. The KBR manager agreed that FKTC could only seek its actual costs, not some standardized rate. (App. supp. R4, tab 242: tr. 4/15). Two days later, on August 4, and after KBR's manager met with FKTC, another KBR subcontract administrator declared in an internal memorandum that the burden of idle time delay costs was upon the government. He also noted that KBR's prior practice had been to pay no more than a $300 price per day for idle truck and

9

driver time. (App. supp. R4, tab 9) Contrary to his written statement that FKTC could only seek costs, the KBR manager accepted $300 as a reasonable, competitive, compensable market price without consideration of its costs (tr. 4/44-56). Indeed, KBR never received any records or data showing FKTC's actual costs (tr. 4/237-39). The KBR manager executed a subcontract change order declaring the government responsible for 83,078 days of delay and adding $24,923,400 to the subcontract price (app. supp. R4, tab 240).

32. KBR paid both REA settlements to FKTC (tr. 5/26-28). It then sought and received reimbursement of the settlements from the government, which were later audited by the Defense Contract Audit Agency (DCAA) (app. supp. R4, tab 275). DCAA requested cost data to support the settlement amounts. KBR never obtained cost information from FKTC, except for data related to the land lease at the Kuwaiti border. (Tr. 4/91, 107, 145, 239, 5/22) DCAA first suspended the settlement amounts, issued an audit report, and then ultimately disapproved them, finding that KBR had failed to obtain cost and accounting data from FKTC to support the payments. The final amount disapproved totaled $51,273,482, which constituted the settlement amounts plus indirect costs and the award fee. (App. supp. R4, tabs 275, 291-92) The government recovered what it had paid (tr. 5/135).

33. The ACO reviewed KBR's settlement with FKTC and sought information to consider a possible settlement of KBR's reimbursement request. After the settlement amounts were disapproved by DCAA, KBR suggested to the ACO that its subcontract with FKTC was a commercial contract. (App. supp. R4, tab 309; tr. 5/53, 114, 133, 146-47)

34. On December 29, 2006, the ACO issued an interim determination allowing $25,564,516 of the total sought by KBR, but leaving the remaining $25,708,966 pending decision while he awaited additional information. The sum allowed by the ACO applied to government-caused delays he recognized requiring the preparation and rental of storage areas, as well as repairs arising from double handling. The ACO's reason for deferring the balance was to await more information related to the quantification of convoy delay days, duplication of equipment, and repairs arising from vandalism. The ACO concluded at the time that the portion allowed was justified because KBR's subcontract with FKTC sought "commercial-type trailers and was awarded utilizing commercial procedures." Thus, "cost or pricing data" was "not required." He concluded that "[a]dequate price analysis was provided." (App. supp. R4, tab 316; tr. 5/145) The ACO stated that the $300 per day convoy delay rate was reasonable and that hundreds of trailers did await convoys at the border for months. But, that fact did not inform how many days individual trucks were delayed. He rejected KBR's use of FKTC's "contrived" delay model for quantifying truck delays, noting that it failed to justify the assumption that trucks became unavailable for alternative work after they deposited their trailers on FKTC's leased land to await

10

convoys. (App. supp. R4, tab 317) The ACO admitted that some of the amounts he allowed were arbitrary (tr. 5/251-52).

35. On November 4, 2010, KBR submitted a certified claim to the ACO for $51,273,482 (app. supp. R4, tab 3). KBR then appealed from the deemed denial to this Board on February 11, 2011, and the appeal was docketed as ASBCA No. 57530. On July 29, 2011, the original ACO issued a final decision. Among other things, he concluded that FKTC's delay model failed to show how long trucks were delayed at the border between Kuwait and Iraq. KBR also failed to obtain adequate information about FKTC's costs for additional equipment to perform double handling. He stressed KBR's failure to field verify any additional equipment, manpower, protection, land preparation, repairs, and double installations. However, the ACO agreed that KBR had sufficiently supported FKTC's land lease cost of $3,600,000. With indirect cost rates and fee, the total recognized was $3,783,005. (App. supp. R4, tab 449) Essentially, the ACO reversed his interim determination that FKTC's cost information was not necessary to allow reimbursement (tr. 5/198, 200, 264). Though the ACO received advice about the matter, his final decision was neither coerced nor mandated by either DCAA or any other government entity (tr. 6/93-94). The final decision was timely appealed to the Board and was docketed as ASBCA No. 58161.

## DECISION

KBR seeks reimbursement of the costs of its REA payments. LOGCAP III's Allowable Cost and Payment clause, which applies to this cost-reimbursement task order, restricts KBR's payments to those permitted under FAR Subpart 31.2. Among other things, FAR 31.201-2 limits allowable costs to those that are "reasonable." *Kellogg Brown & Root*, 728 F.3d at 1358 (KBR may only receive its reasonable costs under LOGCAP III). FAR 31.201-3 establishes standards for the assessment of cost reasonableness. It states:

> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

11

Cost reasonableness is a question of fact for the Board to decide. *Kellogg Brown & Root,* 728 F.3d at 1360. KBR bears the burden to prove the costs it seeks are reasonable. *Id.* at 1363. Reasonableness is ascertained based upon the circumstances existing at the time the costs were incurred. *Kellogg Brown & Root Servs., Inc. v. United States,* 742 F.3d 967, 972 (Fed. Cir. 2014); *Kellogg Brown & Root Servs., Inc.,* ASBCA No. 58081, 17-1 BCA ¶ 36,595 at 178,263 (citing *Boeing Aerospace Operations, Inc.,* ASBCA Nos. 46274, 46275, 94-2 BCA ¶ 26,802 at 133,282). FAR 31.201-3(b) provides a non-exhaustive set of considerations that can inform what is reasonable. They include:

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arms-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and—

(4) Any significant deviations from the contractor's established practices.

I.     The Delay REA

A.   No Government Failure to Perform the Prime Contract

KBR incurred the cost of FKTC's delay REA upon the premise that the government had delayed FKTC's transport of trailers into Iraq by 83,078 days (findings 27-31). FKTC's delay model assumed the government was obligated to commence escorting into Iraq any trailers that reached Navistar the day after arrival (finding 28). Without ascertaining the government's position, KBR agreed to the validity of the REA after concluding that the burden of idle time delay costs was upon the government (finding 31). General Condition 3.2.5 of the subcontract entitled FKTC to an equitable adjustment by KBR in the event of delay due to a government failure to perform its prime contract responsibilities (finding 8). Thus, the first question presented is whether it was reasonable for KBR to conclude that the government failed to perform the prime contract.

Change 5 to TO 59 stated that "[t]he government [would] provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines" (finding 3). KBR inserted similar language into its subcontract with FKTC

12

(finding 6). KBR does not contend that the military failed to provide security for FKTC's trailer convoys in accordance with applicable guidelines. Nor does it suggest the military made anything less than its best efforts to place trailers into convoys as soon as possible given the existing conditions. In fact, it concedes the military made its best efforts. (Tr. 11/95) Indeed, along with KBR, the military worked as hard as it could to support the troops and get convoys out of Kuwait and into Iraq (finding 15). KBR suggests the government failed its TO 59 obligations by not providing convoys within sufficient time to prevent FKTC's trailers and trucks from having to wait at the border (tr. 11/44-46). Alternatively, it contends that, in lieu of providing immediate access to secured convoys, the government was obligated to alter KBR's period of performance.

Contrary to KBR's assertions, a prudent person in the conduct of a competitive business would not have concluded that it owed FKTC monetary compensation because of the timing of the government's convoy assignments.[3] Nothing in Change 5. or for that matter KBR's fixed-price subcontract with FKTC, identified a specific time table that the military and KBR were obligated to follow to place trailers into secured convoys. Thus, neither KBR nor FKTC had any contractual right to expect the military to place any and all trailers arriving at Navistar into convoys the very next day, as is assumed by FKTC's delay model (finding 28).[4]

---

[3] KBR relies upon a single judge order, limiting the government's discovery, that says the merits of FKTC's REAs are not before the Board, and the Board will make no findings of fact as to how much money FKTC was entitled to recover under the REAs (Bd. corr. file, order dtd. Dec. 19, 2012). It is true that this is not an appeal by FKTC regarding its entitlement. FKTC was not in privity of contract with the government. However, the Board must address the extent of KBR's contractual obligations to FKTC to determine whether the costs it incurred paying the REAs were those that would be incurred by a prudent person in the conduct of competitive business. This is especially the case here, where no competitive restraints otherwise constrain payment, and the arm's-length bargaining between KBR and FKTC informs what costs are reasonable.

[4] KBR suggests that it was reasonable for it to incur the costs of FKTC's delay REA based upon statements by CDR Kent Caldwell of DCMA in Kuwait. CDR Caldwell's internal email addressing the capacity of Navistar vaguely observed that he would "hate to think what we are paying to have these trucks sitting there with containers on them not moving." During his testimony he also cryptically agreed that "[i]t was understood that Army was going to pay for the inefficiencies associated with the way things were working." (App. supp. R4, tab 152 at 5371; tr. 3/154) Separately, KBR cites an August 2004 after-action report issued by the commander of the Army's LOGCAP Support Unit generally observing that contractor force protection delayed performance. It declared that "[t]he government cannot hold the contractor responsible for

13

The absence of an express promise by the government was especially meaningful under these circumstances. Months before TO 59 or Change 5 were issued, KBR knew of the extraordinary hazards on MSR Tampa and convoy force protection challenges. Its vehicles were attacked and, unfortunately, its affiliated personnel were killed there. In June of 2003, the military had imposed movement restrictions requiring escorts of all assets into Iraq. It was impossible for everything to move across the border immediately. Insurgents disrupted convoys. Not surprisingly, the CJTF-7 commander prioritized food, fuel, ammunition, and medical supplies ahead of trailers. Change 5 required its mission to proceed "in accordance with established and provided priorities." KBR understood the military established the priority of shipments. (Findings 3, 13-14) It was not reasonable to expect a different order of priority without express contract language to that effect. KBR made a conscious decision to pass on the risks associated with these challenges to subcontractors like FKTC through a fixed-price subcontract. It understood the fixed price covered any "prolonged delays at the border." (Findings 5-6)

KBR maintains that the Board's previous decision in *Kellogg Brown & Root Services, Inc.*, ASBCA No. 56358 *et al.*, 17-1 BCA ¶ 36,779, dictates a ruling in its favor under the collateral estoppel doctrine. Collateral estoppel, otherwise known as issue preclusion, "protects the finality of judgments by 'preclud[ing] relitigation in a second suit of claims actually litigated and determined in the first suit.'" *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (citing *In re*

---

these delays because force protection is a government obligation." (App. supp. R4, tab 241 at 8027)

As this Board has held, "[d]etermining the meaning of a contract starts with its language" and "[w]hen the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the [Board] may not look to extrinsic evidence to interpret its provisions." Furthermore, "[c]onstruction of the language of the contract to determine whether there is an ambiguity is [also] a question of law." Therefore, "[e]xtrinsic evidence cannot be used to create an ambiguity where none otherwise exists." *Auto. Mgmt. Servs. FZE*, ASBCA No. 58352, 15-1 BCA ¶ 36,119 at 176,329 (citations omitted). KBR has not identified any relevant ambiguity in Change 5 that requires resort to extrinsic evidence. Thus, the opinions it relies upon are irrelevant. Additionally, KBR does not suggest that it knew about these statements, or relied upon them, when deciding it was reasonable to consent to FKTC's REAs. Furthermore, CDR Caldwell had no contracting authority over TO 59, he did not purport to interpret its specific terms, and he was unfamiliar with KBR's obligations under its subcontracts (tr. 3/143-45, 154-57). Similarly, there is no evidence that the commander of the LOGCAP Support Unit had any contracting responsibility for TO 59 or purported to authoritatively interpret its specific terms.

*Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994)). Two of the elements to its application are that the issue is identical to one decided in the first action, and the issue was actually litigated in the first action. *Id.*

In ASBCA No. 56358, the Board found that the military did not provide the level of force protection promised for other materials and services delivered by KBR under TO 59, and therefore the government was in breach. KBR and the subcontractors identified in that appeal ultimately had to use private security to perform their work. In contrast, here KBR does not accuse the military of providing a contractually inadequate level of protection for its trailers. Everything that moved did receive force protection (finding 14). KBR merely claims the military did not act fast enough under its Change 5 obligations to place FKTC trailers into secured convoys, backing trailers up at the border. ASBCA No. 56358 did not address, much less hold, that Change 5 dictated time limits upon the government's provision of convoy security for the trailers required by it. This appeal is not relitigating that question.

KBR also suggests that Change 5's requirement upon KBR that it complete delivery of the trailers by December 15, 2003, constituted a guarantee by the government that its convoy security would enable KBR to comply. Change 5 does not expressly make that promise and to infer it is unreasonable given the circumstances. KBR also contends that if the government was not going to provide enough convoys to enable FKTC's trailers to avoid waiting at the border, then KBR was entitled to an extension to the period to perform Change 5. Absent such an extension, it was reasonable to conclude that FKTC was entitled to monetary compensation under the subcontract. (Tr. 11/48) Indeed, the subcontract allowed for more time in the event of convoy delays and required FKTC to bear the expense of adjustments to its working hours, manpower, equipment, etc., as deemed necessary by KBR (finding 7). Notably, in a series of its own subcontract change orders, KBR granted FKTC extensions of the period of performance until August 1, 2004 (findings 16, 20). There is no evidence that the government objected to these extensions or took any adverse actions in response to them. The record simply does not support a conclusion that, despite convoy delays, KBR and FKTC were still required to comply with the December 15 deadline.

At bottom, FKTC executed a fixed-price subcontract with KBR for the delivery of trailers to the government. Though FKTC was entitled to an equitable adjustment in the event of delays stemming from a government failure to perform the prime contract, nothing in Change 5 required the government to place FKTC's trailers into convoys without delay. KBR concedes the government made its best efforts. The government worked as hard as it could to get convoys out of Kuwait. Furthermore, it was clear from events occurring at the border prior to the issuance of Change 5 that there could be no expectation that trailers would receive priority. When convoy limitations slowed FKTC's delivery of trailers past the December 15, 2003, deadline, KBR granted FKTC appropriate extensions, without government objection. Given the absence of a government failure to

15

perform its promises, a prudent person in the conduct of competitive business would not have incurred the cost of any extra compensation to FKTC.

### B. KBR's Indifference to FKTC's Actual Costs and Acceptance of Proposed Prices to Settle the REA was Not Reasonable

Even if the government's convoy scheduling in some way failed its prime contract responsibilities and delayed FKTC, KBR has not shown that a prudent person in the conduct of competitive business would have incurred the cost of the delay REA payments it made to FKTC. Multiple reasons lead to this conclusion.

Under the subcontract, KBR was responsible for paying an "equitable adjustment" to FKTC in the event of a government performance failure causing delay (finding 8).[5] "Equitable adjustment" is a term of art. *United Launch Services, LLC,* ASBCA No. 56850 *et al.,* 16-1 BCA ¶ 36,483 at 177,764; *Gen. Builders Supply Co. v. United States,* 409 F.2d 246, 250 (Ct. Cl. 1969). "Equitable adjustments...are simply corrective measures utilized to keep a contractor whole." *Bruce Constr. Corp. v. United States,* 324 F.2d 516, 518 (Ct. Cl. 1963). They are "closely related to and contingent upon the altered position in which the contractor finds himself." *Id.; see Sauer Inc. v. Danzig,* 224 F.3d 1340, 1348-49 (Fed. Cir. 2000) (observing an equitable adjustment covers increased costs resulting from a change, or changed conditions, leading to extra work); *VHC Inc. v. Peters,* 179 F.3d 1363, 1366-67 (Fed. Cir. 1999) (stating "[a]n equitable adjustment makes a contractor whole after the Government modifies a contract," and "depends on actual costs incurred"). An equitable adjustment reflects "'a particular contractor's costs,' and not the universal, objective determination of what the cost would have been to other contractors at large." *Bruce Constr.,* 324 F.2d at 518-19. Thus, an equitable adjustment is not based upon market prices, but reasonable incurred costs. *Software Design, Inc.,* ASBCA Nos. 23616, 24897, 82-2 BCA ¶ 16,073 at 79,740. "This consideration of the particular contractor's actual and probable costs is tied to the overall function meant to be served by equitable adjustments," which is to keep a contractor whole. *Nager Electric Co. v. United States,* 442 F.2d 936, 946 (Ct. Cl. 1971). An equitable adjustment's use of actual cost data ensures that it does not produce a windfall. *See Propellex Corp. v. Brownlee,* 342 F.3d 1335, 1338 (Fed. Cir. 2003).

Though KBR's managers recognized that FKTC's delay REA could only seek its actual costs, and did not entitle FKTC to payment for convoy delays, KBR did not ultimately require evidence of costs before agreeing to pay $24,923,400 to FKTC (finding 31). Instead, KBR adopted $300 per night as a reasonable market price for idle trucks based upon a review of other business KBR conducted (*id.*). However,

---

[5] The subcontract was governed by Texas law (finding 6). Neither party cites any authority explaining how Texas defines the term "equitable adjustment," but neither do they suggest that it differs from the law of this jurisdiction.

general market prices do not demonstrate FKTC's actual idle truck costs. They would largely be driven by what FKTC actually paid to lease the trucks (which FKTC knew but did not disclose) and how much it actually paid its drivers. Additionally, instead of requiring actual evidence of the number of days trucks were delayed, KBR accepted an unrealistic FKTC model of delay days developed from a series of perfect assumptions, such as that each day the necessary number of trucks to complete performance on time actually arrived at the border (though in fact that did not always happen), that travel time was always the same (not true), and that everything worked flawlessly. Significantly, the model also ignored the fact that, once FKTC procured land for a laydown yard at the border, it removed trailers from trucks and placed them in the yard, relieving at least some trucks and drivers from having to remain idle the entire time trailers were delayed. The model is also inconsistent with contemporaneous records FKTC did maintain showing the number of trucks at the border on specific dates, and with communications attached to the REA between FKTC and KBR about truck and or trailer status on specific days. (Findings 27-29) KBR has not demonstrated that the FKTC model approximates the actual events that occurred.

KBR suggests that it was unlikely FKTC possessed cost information because its expert believed that many international contractors lack records of their costs (tr. 7/203-04). That opinion says nothing about FKTC in particular. FKTC was one of Kuwait's largest companies, with over 70 subcontracts with KBR alone, contracts with the government including embassy construction, and other multimillion-dollar projects. Its founder was an expert in finance and it maintained a separate finance department. It was a sophisticated company. (Finding 11) Despite its numerous other subcontracts with FKTC, KBR failed to present any direct evidence that it knew FKTC did not maintain cost records. Added to these factors is that FKTC was required by its subcontract with KBR to support equitable adjustments with detailed cost breakdowns in conformance with FAR Part 31 and the DoD FAR Supplement. It was also required to maintain books and records reflecting its subcontract performance and make them available to KBR for cost-reimbursement purposes. (Findings 9-10) Indeed, FKTC knew its truck lease costs but declined to disclose them. FKTC also maintained records of when trucks carrying trailers crossed the border, and records of the number of trucks waiting at the border on specific dates. (Finding 27) It simply strains credulity that it did not record how much it actually paid its drivers while they waited at the border or how long trucks actually waited, especially given that it would ultimately seek millions of dollars in additional compensation for these events. It is highly unlikely that a company could grow to the size and sophistication of FKTC without tracking its costs. Significantly, KBR has not contended that it asked for such records at the time the REAs were submitted, or knew that they did not exist. It was not reasonable for KBR to simply assume they did not exist. It was not reasonable for FKTC to consider their absence acceptable, especially in light of FKTC's record-keeping responsibilities contained in the subcontract.

17

KBR also spent much of the hearing and its briefing contending that its subcontract with FKTC was for commercial items. It implies for that reason it was legally barred by the FAR from basing a subcontract REA with FKTC upon actual costs.[6] That is not true.

The FAR's definition of a commercial item is lengthy. A non-exhaustive summary is that it encompasses items that are customarily used for nongovernmental purposes that have been offered or sold to the general public, including items with minor modifications that are not commercially available. Support services for the item are commercial too if the source offers them contemporaneously to the general public under similar terms and conditions using the same work force. Services offered and sold competitively in substantial quantities in the commercial market based on established catalog or market prices under standard commercial terms and conditions are also commercial items. FAR 2.101 (2001).

KBR focuses upon FAR Subpart 15.4 which relates to contract pricing. It claims FAR 15.402 through 15.404 and 43.204(b)(4) prohibit a contracting officer from seeking information about a contractor's costs arising from delayed or changed work on a commercial items prime contract, limiting review of an REA to a comparison of previously proposed and actual government contract prices. KBR says that is what it did here when it settled the delay REA for its subcontract. It concluded that a $300 per night price to be paid to FKTC for idle trucks was reasonable upon a review of other purchases it made for such services.

There is no evidence FKTC ever relied upon the FAR interpretation proffered now by KBR to justify settling its REAs on the basis of prices instead of costs. Nor has KBR shown that it previously employed this interpretation when settling any other subcontract REAs (and it had 70 other subcontracts with just FKTC) and then received reimbursement from the government. It also cites no legal precedent supporting its contention.[7] Indeed, KBR concedes the opposite is true. It admits that a prime

---

[6] KBR focuses upon FAR provisions dating to LOGCAP III's award in 2001.

[7] The best case relied upon by KBR is *United Launch Services, LLC*, ASBCA No. 56850 *et al.*, 14-1 BCA ¶ 35,511. There, the Board recognized that the limitation of prime contract equitable adjustments to costs when they arise from unilateral changes does not necessarily apply to the FAR's commercial items changes clause, which requires bilaterally negotiated changes and equitable adjustments to prime contracts. In that context, the equitable adjustment could account for changed market conditions. *Id.* at 174,067. KBR's subcontract with FKTC does not contain the FAR's commercial items changes clause. Its changes clause permits unilateral changes and requires REAs to be supported with costs conforming to FAR Part 31 (app. supp. R4, tab 62 at 4947-48). Nothing in *United Launch Services* dictates that the equitable adjustment of an

18

contractor such as itself is not legally required to adhere to the FAR in administering its subcontracts. It says that at some unstated time it simply volunteered to follow that approach anyway. KBR acknowledges that, at most, the FAR "provides a useful framework for analyzing the issues in these appeals." [8] (App. br. at 47 n.20) Typically, prudent people engaged in a competitive business are incentivized to limit their financial liability, not conjure reasons to enlarge it they admit are not legally binding upon them and were not advanced by the party seeking payment. *See Kellogg Brown & Root*, 728 F.3d at 1360-61 (acknowledging the lower court's conclusion that prudent business people seize advantages and may not manufacture higher costs for the government). KBR has simply not shown that its commercial items theory provides a reasonable basis for it to have ignored FKTC's costs and resolve the REAs based upon a price comparison.[9]

---

allegedly commercial subcontract must ignore costs and rely only upon a price analysis.

[8] KBR also overstates the FAR provisions upon which it relies. Within FAR Subpart 15.4's framework for negotiating contract pricing is FAR 15.403-1(b)(3)'s prohibition upon the contracting officer requiring cost or pricing data when acquiring a commercial item. Cost or pricing data is a term of art encompassing all facts prudent buyers and sellers would reasonably expect to affect price negotiations significantly. The data must be certified. FAR 15.401 (2001), *see also* FAR 2.101 (2017). As part of the negotiation of an equitable adjustment resulting from change orders, FAR 43.204(b)(4) requires a cost analysis (as described in FAR 15.404-1(c)) "if appropriate." Neither provision purports to announce a new definition of the term "equitable adjustment" when applied to commercial items contracts, or outlaw consideration of a contractor's costs of work already performed to the determination. Nor does the Contract Pricing Reference Guide relied upon by KBR support its argument. That non-binding reference's section discussing equitable adjustments is consistent with the historical definition, stating that "[t]he cost for added work already performed should be the reasonable actual cost of the work required" (app. supp. R4, tab 454 at 11062). Its advice that cost and pricing data as defined by FAR 15.401 should not be required to evaluate proposed modifications of commercial items contracts does not purport to change the standard for determining an adjustment for work performed.

[9] KBR suggests its commercial item theory deserves some heightened consideration because the ACO's interim determination regarding the REA settlements indicated that price analysis was sufficient and allowed some of the costs KBR seeks here. The ACO also admitted that some of the amounts he allowed were arbitrary. (Finding 34) Notably, the ACO then changed his mind about the matter in his final decision and denied all recovery except for the lease at the border (finding 35). Most significantly, the reasonableness of KBR's costs are ultimately a question of fact for the Board to decide. *Kellogg Brown & Root,* 728 F.3d at 1360; *see also Wilner v. United States,* 24 F.3d 1397, 1491 (Fed.

19

KBR's commercial items theory is precluded for other reasons too. Significantly, LOGCAP III incorporated FAR 52.244-6 (finding 1). That clause, which among other things strictly limited the FAR's applicability to pricing commercial items subcontracts to specific clauses inapplicable to this appeal, required KBR to include its terms in any subcontracts for commercial items. KBR's subcontract with FKTC does not do so. Indeed, nothing in the subcontract states that the parties considered it to be for commercial items.

KBR also contends that its settlement with FKTC comports with the "jury verdict" method of approximating damages discussed in *Hi-Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1376 (Fed. Cir. 2004). The jury verdict has been recognized by the court of appeals "when damages cannot be ascertained by any reasonable computation from actual figures." *Id.* However, it is not appropriate when other, more exact methods would apply. *Grumman Aerospace Corp. v. Wynne,* 497 F.3d 1350, 1358 (Fed. Cir. 2007). One of the conditions necessary for applying the approach is "that there is no more reliable method for computing damages." *Id.* KBR maintains that requirement is met here because it "did not have actual cost data from FKTC" (app. br. at 69-70). That is because KBR unreasonably declined to require FKTC's cost data or FKTC unreasonably failed to maintain it in accordance with the subcontract's terms. The jury verdict method does not relieve KBR from FAR Part 31's limitation of its recovery to costs that are reasonable.

In sum, KBR has not shown that a prudent person conducting a competitive business would have resolved FKTC's delay REA based upon the model submitted by FKTC. That model was not realistic and did not approximate FKTC's actual costs arising from a delay. KBR has not shown that FKTC lacked such information, why it would lack such information, or why it would be reasonable not to have such information given the subcontract's record-keeping mandate and requirement to support REAs with actual costs. KBR has not shown that its settlement of the delay REA with FKTC for $24,923,400 was reasonable.

II.     KBR's Settlement of the Double Handling REA on the Basis of Prices and Not Costs was Also Unreasonable

KBR's request for reimbursement of the double handling REA suffers from similar flaws as the delay REA. The $23,831,147.25 double handling REA encompassed double handling at both the Kuwait border due to convoy backups, and at the camps due to site availability; repairs arising from double handling, poor site preparation, and government use; and $3,600,000 for the lease of land for the laydown yard in Kuwait (finding 26). Given that Change 5 did not contemplate double

---

Cir. 1994) (en banc) (contracting officer's findings are not entitled to deference).

handling arising from late site preparation, there is some merit to the conclusion that the camp double handling work and resulting trailer repairs constituted changed work. However, with one exception FKTC failed to support the double handling REA elements with its costs.[10]

Like the delay REA, FKTC based its request upon rates and prices for its equipment and services, not costs. This was despite the fact that it maintained records of its equipment costs. Like the delay REA, KBR was indifferent to FKTC's costs, focusing solely on FKTC's price demands for its services and its own opinions about price reasonableness. Furthermore, KBR never verified what additional equipment was used by FKTC to perform the changed work. (Findings 21-23, 25) KBR has failed to show that it received or reviewed any invoices or other records of costs before paying the REA. However, FKTC was required by its subcontract to support an REA arising from changed work with costs conforming to Part 31, not proposed prices (finding 9). Like the delay REA, KBR also advances its commercial items and jury verdict theories to support its recovery. For the reasons previously given, they are rejected. A prudent person conducting a competitive business would not have ignored the subcontract's requirement that an REA based upon changed work was to be supported with costs, as KBR did. KBR has not shown that its settlement of the double handling REA, for $23,831,147.25, based upon proposed prices for the various services, was reasonable.

### CONCLUSION

KBR is not entitled to any recovery. The appeals are denied.

Dated: November 19, 2018

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[10] The lease amount for the laydown yard plausibly flows from FKTC's costs. However, as explained above, KBR has not shown that FKTC was entitled to an equitable adjustment of its fixed-price subcontract because of backups at the border. Thus, it has not demonstrated that it was reasonable for KBR to incur the cost of double handling at the border or for laydown yard.

21

I concur                                      I concur


_____    _____
RICHARD SHACKLEFORD                      OWEN C. WILSON
Administrative Judge                          Administrative Judge
Acting Chairman                                Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                           of Contract Appeals



     I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 57530, 58161, Appeals of
Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's
Charter.

     Dated:


_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals